# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CATLIN SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| CBL & ASSOCIATES PROPERTIES, INC., CBL & ASSOCIATES LIMITED PARTNERSHIP, CBL & ASSOCIATES MANAGEMENT, INC., and JG GULF COAST TOWN CENTER, LLC, | ) ) ) ) ) ) ) ) ) | C.A. No. N16C-07-166 PRW CCLD |
| Defendants. | ) | |

Submitted: June 20, 2017
Decided: September 20, 2017

*Upon Defendants CBL & Associates Properties, Inc., CBL & Associates Limited Partnership, CBL & Associates Management, Inc., and JG Gulf Coast Town Center, LLP's Motion for Judgment on the Pleadings,*
**DENIED**.

*Upon Plaintiff Catlin Specialty Insurance Company's Motion for Judgment on the Pleadings,*
**GRANTED**.

## MEMORANDUM OPINION AND ORDER

Emily K. Silverstein, Esquire, Marks, O'Neill, O'Brien, Doherty & Kelly P.C., Wilmington, Delaware, Louis H. Kozloff, Esquire (*pro hac vice*) (argued), Goldberg Segalla LLP, Philadelphia, Pennsylvania, Attorneys for Plaintiff.

John A. Sensing, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Alan E. Popkin, Esquire (*pro hac vice*), David W. Sobelman, Esquire (*pro hac vice*), Melissa Z. Baris, Esquire (*pro hac vice*), Husch Blackwell LLP, St. Louis, Missouri, Attorneys for Defendant.

**WALLACE, J.**

## I. INTRODUCTION

Plaintiff Catlin Specialty Insurance Company ("Catlin") and Defendants CBL & Associates Properties, Inc., CBL & Associates Limited Partnership, CBL & Associates Management, Inc. (collectively, "CBL Defendants"), and JG Gulf Coast Town Center, LLC ("GCTC") each ask this Court to enter a declaratory judgment outlining the rights and obligations of an insurance policy between Catlin and CBL Defendants in connection with claims asserted against CBL Defendants by Wave Lengths Hair Salon of Florida, Inc. d/b/a Salon Adrian ("Salon Adrian"). Salon Adrian's claims against CBL Defendants are currently pending in the United States District Court for the Middle District of Florida ("Underlying Action").[1] Salon Adrian's lawsuit against the CBL Defendants and GCTC arises out of those defendants' allegedly fraudulent scheme devised to purposefully and fraudulently overcharge Salon Adrian (and many others) for electricity.

Following the filing of that suit, CBL Defendants and GCTC sought Catlin's insurance coverage for the Underlying Action, pursuant to a policy in effect from December 31, 2015 until December 31, 2016 (the "Catlin Policy").[2] In this action, Catlin argues that each and every claim in the Underlying Action is based upon

---

[1]  *See Wave Lengths Hair Salon of Fl., Inc. d/b/a Salon Adrian, et al. v. CBL & Assocs. Props., Inc., et al.*, Case No. 2:16-cv-00206-SPC-MRM.

[2]  Policy No. CPL-680077-1216.

-1-

Defendants' allegedly intentional, knowing, and wrongful conduct.[3] And so, Catlin argues: its policy does not cover such claims; it has no duty to defend CBL Defendants in the Underlying Action; and it has no obligation to pay any defense costs or damages incurred by the litigation. CBL Defendants and GCTC counter that they are entitled to Catlin's insurance coverage because the Underlying Action involves alleged negligent acts, errors, or omissions in the rendering of professional services—something explicitly covered by the Catlin Policy.[4]

Before the Court are each side's cross-motions for Judgment on the Pleadings.[5] Each asks for declaratory judgment that there either is or is not coverage under the Catlin Policy.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Catlin is a Delaware corporation with its principal place of business in Atlanta, Georgia.[6] Defendant CBL & Associates Properties, Inc., is a Delaware corporation with its principal place of business in Chattanooga, Tennessee.[7]

---

[3]   Pl.'s Mot. for J. on the Pleadings, at 1, C.A. No. N16C-07-166 PRW CCLD (Del. Super. Ct. Jan. 17, 2017) (D.I. 26) [hereinafter Pl.'s Mot.].

[4]   Def.'s Mot. for J. on the Pleadings, at 1, C.A. No. N16C-07-166 PRW CCLD (Del. Super. Ct. Jan. 17, 2017) (D.I. 27) [hereinafter Def.'s Mot.].

[5]   *See* DEL. CODE. ANN. tit. 10, § 6501 (Delaware's Uniform Declaratory Judgment Act).

[6]   Pl.'s Compl. ¶ 2.

[7]   Pl.'s Compl. ¶ 3.

Defendant CBL & Associates Limited Partnership is a limited partnership organized under the laws of Delaware, with its principal place of business in Chattanooga, Tennessee.[8] CBL & Associates Management, Inc., is a Delaware corporation with its principal place of business in Chattanooga, Tennessee.[9] Defendant GCTC is a limited liability company organized under the laws of Ohio, with its principal place of business in Chattanooga, Tennessee.[10]

### A. THE UNDERLYING FLORIDA ACTION GIVES RISE TO THIS DELAWARE LITIGATION.

On March 16, 2016, on behalf of itself and all others similarly situated, Salon Adrian filed suit against "CBL & Associates, Inc." alleging that company had "executed a fraudulent scheme through a criminal enterprise to overcharge small business tenants for electricity at its shopping malls" resulting in "fraudulent and illegal markups [that] exceeded 100% of the tenant's actual electricity usage charges."[11] On July 1, 2016, Salon Adrian amended the complaint, naming CBL Defendants and GCTC.[12]

---

[8] Pl.'s Compl. ¶ 4.

[9] Pl.'s Compl. ¶ 5.

[10] Pl.'s Compl. ¶ 6.

[11] Pl.'s Compl. ¶ 13 (Ex 1 (Pl. Salon Adrian, *et al.* Compl. ¶ 1)).

[12] Pl.'s Compl. ¶ 14 (Ex. 2 (Pl. Wave Lengths Hair Salon of Florida d/b/a Salon Adrian, et al. Am. Compl.)).

Underlying Plaintiff Salon Adrian is an upscale salon located in the GCTC, a shopping mall in Fort Myers, Florida.[13] In 2006, Salon Adrian executed a ten-year lease with JG Gulf Coast, the owner of GCTC,[14] with CBL Management signing as JG Gulf Coast's agent.[15] One lease provision concerned billing for utilities.[16] Section 2.5 of the Lease stated:

> Tenant shall pay promptly, as and when the same become due and payable, all water rents, rates and charges, all sewer rents and all charges for electricity, gas, heat, steam, hot and/or chilled water, air conditioning, ventilating, lighting systems, and other utilities supplied to the Leased Premises. If any such utilities are not separately metered or assessed or are only partially separately metered or associated and are used in common with other tenants in the Shopping Center, Tenant will pay to Landlord a proportionate share of such charges in addition to Tenant's payments of the separately metered charges. Landlord may install registering meters and collect any and all charges aforesaid from Tenant, making returns to the proper utility company or government unit, provided that Tenant shall not be charged more than the rates it would be charged for same services if furnished directly to the Leased Premises by the Local Utility Company, as hereinafter defined.[17]

---

[13] Pl.'s Compl. Ex. 2 ¶ 8.

[14] Pl.'s Compl. ¶ 11.

[15] Pl.'s Compl. Ex. 2 ¶ 19. The lease is Exhibit A to Plaintiff's Compl. Ex 2.

[16] Pl.'s Compl. Ex. 2 ¶ 20. *See also id.* Ex. 2, Ex. A at 7.

[17] *See id.* Ex. 2 ¶ 20. *See also id.* Ex. 2, Ex. A at 7.

-4-

As expected, Salon Adrian began receiving electricity invoices.[18] Its energy bills averaged $500–$600 per month.[19] Sometimes, though, the bills would range from $600-$700 per month, far higher than Salon Adrian paid at another location it operated.[20] In response, Salon Adrian began to "tak[e] on additional debt to purchase state of the art high efficiency lightbulbs and other products."[21] It also upgraded to energy-efficient appliances.[22] Nothing helped. Salon Adrian's bills continued to average $600 per month.[23]

Concurrently, CBL Defendants had a contract with non-party Valquest, an energy audit company.[24] Valquest provided CBL Defendants and its tenants with energy surveys. According to Salon Adrian, the surveys project energy costs or substantiate CBL Defendants' billed energy costs.[25] Salon Adrian says the CBL

---

[18]  Pl.'s Compl. Ex. 2 at ¶ 24.

[19]  *Id.*

[20]  *Id.*

[21]  *Id.* at ¶ 27.

[22]  *Id.*

[23]  *Id.* ¶ 28.

[24]  *Id.* ¶¶ 29–30.

[25]  *Id.* ¶ 29.

Defendants directed Valquest to inflate its electricity costs in its projections or audits and that CBL Defendants reaped the profits.[26]

In 2009, Salon Adrian complained to CBL Defendants about Salon Adrian's rising electricity costs.[27] In May of that year, Valquest performed an energy audit for Salon Adrian at CBL Defendants' request in order to justify its electricity charges.[28] Salon Adrian contends that the audit results are inflated.[29]

In September 2015, Wells Fargo sued JG Gulf Coast for defaulting on its mortgage loan.[30] Wells Fargo assumed ownership of GCTC and hired new management.[31] The new operator performed its own electrical usage audit.[32] It informed Salon Adrian that Salon Adrian's energy charge would be reduced to $269.00/month, less than half the $600–$700 Salon Adrian had normally been charged.[33]

---

[26]     *Id.* ¶ 30.

[27]     *Id.* ¶ 31.

[28]     *Id.*

[29]     *Id.*

[30]     *Id.* ¶ 32.

[31]     *Id.*

[32]     *Id.* ¶ 33.

[33]     *Id.* ¶ 34.

Once Salon Adrian confirmed its previous suspicions that it had been paying allegedly inflated electricity prices for about a decade, it filed the Underlying Action. In it, Salon Adrian suggests that CBL Defendants' conduct occurred nationwide, and seeks to certify several groups of classes.[34]

Salon Adrian alleges six causes of action against the CBL Defendants. First, Salon Adrian contends CBL Defendants violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act.[35] Second, it alleges CBL Defendants are unjustly enriched by receiving inflated payments for electricity from tenants nationwide. Third, it alleges CBL Defendants violated Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").[36] Fourth, it alleges CBL Defendants violated Florida's Civil Remedies for Criminal Practices Act.[37] Fifth, it alleges that JG Gulf Coast breached its contract by charging inflated electricity rates. Last, it alleges that JG Gulf Coast breached the implied covenant of good faith and fair dealing.

---

[34] *See id.* ¶¶ 41–52 (allegations and argument for class certification).

[35] 18 U.S.C. § 1962(A), (C), & (D).

[36] FLA. STAT. § 501.201–23.

[37] FLA. STAT. § 772.101–19. Catlin says this is Florida's version of RICO.

-7-

## B. CBL DEFENDANTS DEMAND CATLIN DEFEND THEM IN THE UNDERLYING ACTION.

Catlin issued a Contractor's Protective, Professional, and Pollution Liability Insurance Policy, No. CPL-680077-1216, to CBL & Associates Properties, Inc. as the Named Insured, with a policy period of December 31, 2015–December 31, 2016.[38] CBL Defendants tendered the Underlying Action to Catlin for coverage.[39] Catlin agreed to defend CBL Defendants under a full reservation of rights, including the right to seek a declaratory judgment that it has no duty to defend or indemnify CBL Defendants.[40] Not surprisingly, Catlin is now seeking such a declaration.

In July 2016, Catlin filed its complaint. In it, Catlin makes three claims. Its first two claims seek declarations that it does not have to cover CBL Defendants and JG Gulf Coast. Its third claim is an unjust enrichment claim.[41] Catlin alleges that its defense of CBL Defendants in the Underlying Action unjustly enriches CBL Defendants at Catlin's expense.

---

[38] Pl.'s Compl. ¶ 22. The Policy is attached to Catlin's Complaint as Exhibit 3.

[39] *Id.* ¶ 23.

[40] *Id.* ¶ 24.

[41] The parties disagree on whether the Court can dispose of this claim via their cross-motions for judgment on the pleadings. Def.'s Br. in Opp. to Pl.'s Mot., at 34, C.A. No. N16C-07-166 PRW CCLD (Del. Super. Ct. Feb. 17, 2017); Pl.'s Ans. Br. in Opp. to Def.'s Mot., at 42, C.A. No. N16C-07-166 PRW CCLD (Del. Super. Ct. Feb. 17, 2017). Because the Court would be required to consider matters outside the pleadings, the Court cannot not rule on Catlin's unjust enrichment claim here. *Mergenthaler v. Asbestos Corp. of Am.*, 500 A.2d 1357, 1360 (Del. Super. Ct. 1985) (stating that "facts and arguments outside the pleadings cannot be considered in a motion for judgment on the pleadings[.]").

## III. CHOICE OF LAW

### A. THE PARTIES' CHOICES OF LAW.

The parties disagree on the law that should govern this action. Catlin says Tennessee law applies, while CBL Defendants argue for Florida law.

Catlin is headquartered in Tennessee. The insurance policy was delivered to CBL Defendants in Tennessee.[42] And CBL Defendants are headquartered in Tennessee.[43] Invoking Delaware's choice-of-law rules, Catlin suggests that the location of the insured's headquarters is an important factor. Catlin notes that Salon Adrian has filed a proposed class action. If that class is certified, then CBL Defendants may face claims nationwide. It would be sensible for the Court to apply Tennessee law to these claims, as Catlin provides nationwide coverage and may be subject to nationwide claims.[44]

On the other hand, CBL Defendants argue for Florida law. CBL Defendants assert that this is an isolated claim; thus, the location of the insured's covered activities should is most important.[45] And, no class has yet been certified. So, CBL

---

[42] Pl.'s Mot. at 19–20.

[43] *Id.*

[44] *Id.*

[45] Def.'s Mot. at 11–12 (citing *Chemtura Corp. v. Certain Underwriters at Lloyd's,* 2016 WL 3884018 (Del. Super. Ct. April 27, 2016)). The Delaware Supreme Court reversed this Court's *Chemtura* decision on March 23, 2017. *See Certain Underwriters at Lloyds, London v. Chemtura Corp.,* 160 A.3d 457, 461 (Del. 2017).

-9-

Defendants currently only face liability in Florida for claims arising under Florida law.

## B. DELAWARE CHOICE-OF-LAW RULES.

Delaware applies its own choice-of-law rules as the forum state.[46] The Court must consider facts in accordance with the most significant relationship test.[47] That test is set forth in the Restatement (Second) of Conflict of Laws Section 188.[48] Section 188 provides:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in [Restatement (Second) of Conflict of Laws] § 6.
>
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and

---

[46]    *Shook & Fletcher Asbestos Settlement Tr. v. Safety Nat'l Cas. Corp.*, 2005 WL 2436193, at *2 (Del. Super. Ct. Sept. 29, 2005), *aff'd,* 909 A.2d 125 (Del. 2006).

[47]    *Id.* at *2.

[48]    *Oliver B. Cannon and Son, Inc. v. Dorr-Oliver, Inc.,* 394 A.2d 1160, 1166 (Del. 1978).

> (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.[49]

Section 188's comment e states the location of the contract's subject matter is an important factor when the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk. "The state where the thing or the risk is located will have a natural interest in transactions affecting it."[50]

Section 6 of the Restatement (Second) of Conflict of Laws enumerates the following factors:

> [T]he factors relevant to the choice of the applicable rule of law include
>
> > (a) the needs of the interstate and international systems,
> >
> > (b) the relevant policies of the forum,
> >
> > (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> >
> > (d) the protection of justified expectations,
> >
> > (e) the basic policies underlying the particular field of law,
> >
> > (f) certainty, predictability and uniformity of result, and
> >
> > (g) ease in the determination and application of the law to be applied.[51]

---

[49] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971).

[50] *Id.* cmt. e (1971).

[51] *Id.* § 6 (1971).

Section 193 of the Restatement (Second) of Conflict of Laws provides:

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.[52]

Where a claim under an insurance policy involves nationwide risk, the Restatement recognizes that Section 193 assumes less significance because there is no single, principal location of the insured risk. And it would be impractical to apply the law of multiple states to a claim under one insurance policy covering multiple locations.[53]

In complex insurance cases with risks in multiple states such as this one, Delaware courts have generally held that the most significant factor for the conflict-of-laws analysis is the principal place of business of the insured because it is "the situs which link[s] all the parties together."[54]

Under *Chemtura*, Tennessee's is the law to apply to this case.[55]

---

[52]    *Id.* § 193 (1971).

[53]    *Id.* cmt. b.

[54]    *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 1991 WL 236936 (Del. Super. Ct. Oct. 29, 1991).

[55]    *Chemtura*, 160 A.3d at 459–60 (The Court explains the proper focus on an insurance contract's contacts where nationwide claims may occur).

-12-

## IV. STANDARD OF REVIEW

Before the Court are the parties' cross-motions for judgment on the pleadings. A party may move for judgment on the pleadings pursuant to this Court's Civil Rule 12(c).[56] In determining a Rule 12(c) motion, the Court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party.[57] The Court must take the well-pleaded facts alleged in the complaint as admitted.[58] The Court also assumes the truthfulness of all well-pled allegations of fact in the complaint.[59] The Court accords a party opposing a Rule 12(c) motion the same benefits as a party defending a motion under Rule 12(b)(6).[60] And so, the Court may grant a motion for judgment on the pleadings only when no material issue of fact exists and the movant is entitled to judgment as a matter of law.[61]

---

[56]     Super. Ct. Civ. R. 12(c).

[57]     *Almah LLC v. Lexington Ins. Co.*, 2016 WL 369576, at *4 (Del. Super. Ct. Jan. 27, 2016) (citing *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993)).

[58]     *Id.*

[59]     *Id.*

[60]     *Id.*

[61]     *Id.*

## V. DISCUSSION

### A. THE RELATIONSHIP BETWEEN CATLIN AND CBL DEFENDANTS AND THE AVAILABLE COVERAGE.

Catlin and CBL Defendants' relationship is wholly contractual. In turn, contract law governs this dispute. The Court must, therefore, look to the language of the contract between CBL Defendants and Catlin to identify what is indemnified and what is defendable.

CBL Defendants are correct; the duty to defend encompasses more than the duty to indemnify. But Catlin need only defend what it may eventually have to pay out in covered claims CBL Defendants incurs. Here, Catlin has agreed to defend CBL Defendants for the Underlying Action and pay any associated expenses (including fees and costs) incurred in defending that Underlying Action under a full reservation of rights. Specifically, Catlin has reserved the following rights: (1) "the right to obtain declaratory judgment that it is not obligated to provide coverage under the [Catlin] Policy for the Underlying Action"; (2) "the right to disclaim any coverage obligations under the [Catlin] Policy, including the duty to provide an ongoing defense . . . [and/or] pay 'Claim Expenses' and/or a duty to indemnify [CBL Defendants]"; and (3) "the right to seek reimbursement for Claim Expenses Catlin pays on behalf of [CBL Defendants] in connection with the Underlying Action."[62]

---

[62] Pl.'s Br. in Support of Its Mot. for J. on the Pleadings at 14–15.

Because the duty between Catlin and CBL Defendants is rooted in their contractual relationship, the language of their contract controls any duty Catlin has to CBL Defendants. The Catlin Policy is a "Contractor's Protective, Professional and Pollution Liability Insurance Policy" that was in effect from December 31, 2015, to December 31, 2016.[63] It provides for claims-made coverage to CBL Defendants.[64]

The Professional Liability portion of the Catlin Policy reads

> The Insurer will pay on behalf of the Insured all sums in excess of any applicable Self-Insured Retention that the Insured is legally obligated to pay as Damages or Claim Expenses because of a Claim for an actual or alleged negligent act, error or omission in the rendering of Professional Services, provided that:
>
> 1. the Claim for such an actual or alleged negligent, act, error or omission is first made against the Insured during the Policy Period and first reported in writing by the Insured to the Insurer within 60 days after either the end of the Policy Period or the end of the Optional Extended Reporting Period, if applicable, and
>
> 2. the Claim arises out of an actual or alleged negligent, act, error or omission performed by the Insured or by a Design Professional for whom the Insured is legally responsible, on or after the Retroactive Date and before the end of the Policy Period . . . .[65]

---

[63]  Compl. ¶ 22.

[64]  *Id.*

[65]  Pl.'s Br., Ex. A, at 15.

-15-

There are two Policy exclusions that are important here. They read:

> This Policy does not apply and the Insurer will not be liable to make payments, defend or indemnify any Insured for any Ultimate Loss, Damages, Pollution Loss, Claim, or Claim Expense, or to pay any amounts pursuant to any Supplemental Coverage, directly or indirectly arising out of any of the following. To the extent an exclusion below applies by reason of the act, error or omission of an Insured, it shall also apply to the act, error or omission of anyone retained by an Insured or for whom the Insured is legally responsible.

*   *   *

> H.  Liability under any contract, agreement, express warranty, or guarantee, unless such liability would have existed in the absence of such contract, agreement, express warranty, or guarantee.

> I.  Any dishonest, fraudulent, criminal, or intentionally or knowingly wrongful, or malicious act, error, or omission or those of an inherently harmful nature, except that this exclusion shall not apply to an Insured who did not commit, participate in, or have knowledge of such conduct.[66]

## B. Rules of Construction and CBL Defendants' attempts to defy the Elementary Rules of Grammar.

CBL Defendants suggest that the Catlin Policy is ambiguous. They surmise that "negligent" modifies only "act," not "error" or "omission." So, they go on, the policy covers *any* error or *any* omissions—not just those that are negligent. Catlin

---

[66] *Id.*, Ex. A, at 23–24.

maintains that the policy follows proper grammar: the adjective negligent precedes all three nouns (act, error, and omission). As such, it modifies all three.

CBL Defendants' interpretation of the policy language ignores the basic tenets of parallelism. The American Heritage Book of English Usage, for instance, instructs that "an initial article, preposition, auxiliary verb, or modifier will tend to govern all elements in the series unless it is repeated for each element. For example, if you set up a series of nouns with the first modified by an adjective, the reader will expect the adjective to modify the rest of the series as well."[67] Here, the adjective "negligent" precedes a series of nouns: "act, error or omission." The comma between "act" and "error" denotes a list.[68]

As well, courts that have addressed the interpretation of the phrase "negligent act, error or omission" have "almost uniformly held that 'negligent act, error or omission' means 'negligent act, negligent error, or negligent omission.' These courts

---

[67] THE AMERICAN HERITAGE BOOK OF ENGLISH USAGE: A PRACTICAL AND AUTHORITATIVE GUIDE TO CONTEMPORARY ENGLISH 53 (Houghton Mifflin Harcourt 1996). *See also Lewis v. Jackson Energy Co-op. Corp.*, 189 S.W.3d 87, 92 (Ky. 2005) ("[T]he first adjective in a series of nouns or phrases modifies each noun or phrase in the following series unless another adjective appears.").

[68] CBL Defendants' appended construction argument – that an errant comma appearing twice in the Catlin Policy after "negligent" in the phrase "actual or alleged negligent, act, error, or omission" "further indicates that negligent does not modify the whole phrase, such that an 'error or omission' need not be negligent to be covered" – is nonpersuasive. If that comma were anything more than a typo, it would mean that the phrase "actual or alleged negligent" is an independent adjectival phrase with no connection to the list of nouns that follows and no connection to any other noun – that is, it would be a modifying phrase with nothing to modify. That reading is nonsensical.

-17-

reasoned that it would be self-defeating for the insurers who draft these contracts to limit coverage for intentional acts, while at the same time covering intentional errors and omissions."[69]

But to support their odd reading, CBL Defendants cite to *Corporate Realty, Inc. v. Gulf Ins. Co.,* an Eastern District of Louisiana case.[70] In *Corporate Realty,* the insured had a professional services policy which covered "errors, omissions, and negligent acts."[71] The *Corporate Realty* court found that an insurer had a duty to defend an insured because the policy covered errors and omissions of any type; only "acts" was modified by the term negligent.[72]

CBL Defendants' reliance on *Corporate Realty* is in vain. The *Corporate Realty* policy language placed the "negligent" directly and only before "acts," leaving "errors" and "omissions" unmodified. But that's not the construct of the Catlin Policy language.

---

[69]     *Acordia Ne., Inc. v. Thesseus Int'l Asset Fund NV,* 2003 WL 22057003, at *2 (S.D.N.Y. Sept. 4, 2003) (listing cases).

[70]     2005 WL 236182 (E.D. La. Jan. 31, 2005).

[71]     *Id.* at *1.

[72]     *Id.* at *7 ("[H]ad Gulf Insurance intended to limit coverage to damages arising out of negligent acts, errors, and omissions, it would have so stated."). *See also Cont'l. Cas. Co. v. Cole,* 809 F.2d 891, 895–96 (DC Cir. 1987) (finding a duty to defend intentional errors in a policy limiting coverage to "errors, negligent omissions and negligent acts.").

-18-

In short, the Catlin Policy provides coverage to CBL Defendants for claims arising out of "negligent acts, errors or omissions." In other words, whatever the act, error, or omission that brings about CBL Defendants' liability, that act must be negligent, that error must be negligent, or that omission must be negligent. If not, that act, error, or omission is not covered.

## C. THE SCOPE OF THE DUTY TO DEFEND AND INDEMNIFY.

Under Tennessee (and Florida)[73] law, a court determines an insurer's duty to defend by examining the allegations in the pleadings.[74] The insurer has a duty to defend when the underlying complaint alleges damages that are within the risk covered by the insurance contract and for which there is a potential basis for recovery.[75] The duty to defend arises even if only one of the complaint's allegations is covered by the policy.[76] And any doubt as to whether the complainant has stated a cause of action within the coverage of the policy is resolved in favor of the insured.[77]

---

[73]    While the parties made much of the choice-of-law question, in reality, Tennessee and Florida law are nearly identical on the salient issues presented here. And Delaware law too is well-aligned with those two sister states' holdings on these issues.

[74]    *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 439 (Tenn. 2012); *Jones v. Fla. Ins. Guar. Ass'n, Inc.*, 908 So. 2d 435, 443 (Fla. 2005).

[75]    *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 305 (Tenn. 2007); *Jones*, 908 So. 2d at 443.

[76]    *Travelers Indem. Co.*, 216 S.W.3d at 305; *Jones*, 908 So. 2d at 443.

[77]    *Travelers Indem. Co.*, 216 S.W.3d at 305; *Jones*, 908 So. 2d at 443.

The Tennessee Court of Appeals, in *Professional Coonhunters Association v. Northfield Insurance Company*, addressed the insurer's duty to defend the insured under a policy providing coverage for claims "arising out of any negligent act, error or omission in rendering or failing to render professional services."[78] Because the Tennessee court found that the complaint did not contain any allegations that the insured committed a "negligent act, error or omission," and instead described intentional and willful conduct on the part of the insured, the insurer had no duty to defend.[79]

Catlin's position is the same as the insurer's in *Professional Coonhunters*. It argues that not one of the Underlying Action's allegations hint at negligence. Instead, it says, the Underlying Action is replete with references to "fraudulent," "intentional," "willful," and "malicious" conduct. The Underlying Allegations, Catlin posits, go well beyond negligence—Salon Adrian alleges that CBL Defendants intended their wrongful acts. So, Catlin concludes, it has no duty to defend.

CBL Defendants propose that Court should look to the "gravamen" of the underlying complaint. CBL Defendants say that Salon Adrian's alleged "fraud"

---

[78] *Prof'l Coonhunters Ass'n v. Northfield Ins. Co.*, 1990 WL 105895, at *5, *11 (Tenn. Ct. App. July 27, 1990).

[79] *Id.* at *11.

boils down to a claim that CBL Defendants billed for utilities differently than how Salon Adrian contends tenants should have been charged.[80] CBL Defendants argue that there is a possibility that they could be liable based on a finding that they just erroneously overcharged tenants in a way that was negligent or unintentionally misleading.[81]

But that's not how the Underlying Action's allegations read. In its complaint, Salon Adrian asserts no theory of recovery that the Court could reasonably deem mere (or any other sort of) negligence. And "courts around the nation are in general agreement that a [professional liability] policy covering 'negligent acts, errors or omissions' does not cover intentionally wrongful conduct."[82]

The Underlying Action alleges no negligent (or even grossly negligent) conduct. Instead, it is based on a plainly pled theory that CBL Defendants engaged in a pattern of intentional, knowing, wrongful, fraudulent conduct. There is no hint in the Underlying Action's claims that CBL Defendants acted in a negligent fashion.

---

[80] *See* Defs.' Opp. to Pl.'s Mot. for J. on Pleadings at 2. *See also id.* at 19 ("While [Wave] embellishes the Florida Complaint with allegations of fraud and conspiracy, the gravamen of its claim is that [CBL Defendants] erroneously charged tenants for utility services. This is precisely the type of error against which the Policy protects [CBL Defendants.]").

[81] *Id.*

[82] *Matthew T. Szura & Co., Inc. v. Gen. Ins. Co. of Am.*, 543 F. App'x 538, 543 (6th Cir. 2013) (citations omitted).

## D. THE FDUTPA CLAIM AND THE BREACH-OF-CONTRACT CLAIM

CBL Defendants argue that certain claims (including the breach-of-contract claim and the FDUTPA claim) are covered because they do not require intent, and therefore cannot be based on "intentional acts."[83] CBL Defendants contend that the claims' lack of required intent may allow this Court to find coverage because CBL Defendants could be found liable for negligently breaching the contract or negligently violating FDUTPA. But the Court cannot find such coverage.

The Court must focus on what the underlying allegations actually are, not what they might be.[84] In *Philadelphia Indemnity Ins. Co. v. Hamic*, the federal district held that one of the claims, malicious prosecution, could be found through gross misconduct.[85] The underlying plaintiff averred specifically that the defendants either knew its assertions were false when made or acted in reckless disregard of

---

[83]    *See, e.g., Phila. Indem. Ins. Co. v. Hamic*, 2012 WL 3835088 (M.D. Fla. Sept. 4, 2012) (finding that a Florida RICO claim was covered under a "negligent acts, errors, or omissions" policy because there was also a companion malicious prosecution count. Under Florida law, the malice intent required for the latter could be inferred by demonstrating "gross negligence." And under Florida law, if one ground for liability alleged in a complaint is within the insurance coverage, the insurer is obligated to defend the entire suit).

[84]    *Travelers Indem. Co.*, 216 S.W.3d at 305; *Jones,* 908 So. 2d at 443 ("Indeed, '[w]hen the actual facts are inconsistent with the allegations in the complaint, the allegations in the complaint control in determining the insurer's duty to defend.'"). *See also Amerisure Ins. Co. v. Gold Coast Marine Distribs., Inc.*, 771 So. 2d 579, 580 (Fla. Dist. Ct. App. 2000) ("The general rule is that an insurance company's duty to defend an insured is determined solely from the allegations in the complaint against the insured, not by the actual facts of the cause of action against the insured, the insured's version of the facts or the insured's defenses.").

[85]    *See Hamic*, 2012 WL 3835088, at *4.

their truth or falsity.[86]   The underlying plaintiff expressly averred further in its complaint that the defendants acted with "legal malice."[87]   And under Florida law, legal malice includes acts of gross negligence.  That was enough to bring one of the complaint's counts, and, in turn, the entirety of the action within the disputed insurance coverage.

Not so here.  Salon Adrian, in the Underlying Complaint, has alleged no semblance of negligent conduct.  Nor has it alleged any claim through which CBL Defendants could be found liable under a negligent theory.  CBL Defendants have pointed to no authority that one can be found to have negligently violated FDUTPA or breached on a contract through a negligent act, error, or omission.  And here Salon Adrian alleges CBL Defendants intentionally and willfully engaged in a decade-long course of conduct designed to defraud its tenants.

---

[86]     *See id.*

[87]     *See id.* at *3.

## VI. CONCLUSION

Because the only reasonable interpretation of the allegations in the Underlying Action sound in intentional conduct, and the Policy does not cover such acts, Catlin's Motion for Judgment on the Pleadings is **GRANTED**, and CBL Defendants' Motion for Judgment on the Pleadings is **DENIED**.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**

-24-